IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LOUISE SPIERING and RAY SPIERING, husband and wife, | ) ) ) | |
| Plaintiffs, | ) ) | 4:04CV3385 |
| v. | ) ) | |
| GOVERNOR DAVE HEINEMAN, in his individual capacity and official capacity as Governor of the State of Nebraska, ATTORNEY GENERAL JON BRUNING, in his individual capacity and official capacity as Attorney General of the State of Nebraska, NANCY MONTANEZ, in her individual capacity and official capacity as Director of the Nebraska Department of Health and Human Services, RICHARD RAYMOND, M.D., in his individual capacity and official capacity as Director of the Nebraska Department of Health and Human Services Department of Regulation and Licensure, and JULIE MILLER, in her individual capacity and official capacity as Coordinator of the Nebraska Department of Health and Human Services Newborn Screening Program, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **MEMORANDUM AND ORDER** |
| Defendants. | ) ) | |

Loving parents want to delay the state-mandated testing of their newly born infants for metabolic diseases because of their sincere religious beliefs and because of their equally sincere and related concern for the health of their children. Just as committed to the well-being of newborns, the State of Nebraska refuses to accommodate the family. Nebraska fervently believes that such an accommodation would harm children.

Realizing that there is very little law on the subject, I decide that Nebraska's newborn testing regime, as now constituted,[1] survives the plaintiffs' challenge.

## I.  BACKGROUND

Cross-motions for summary judgment have been filed. The plaintiffs' statement of undisputed facts appears at filing 76, pages 1-7, and the defendants' statement of undisputed facts appears at filing 70, pages 1-5.

Since neither side contested the opponent's facts, all of them are admitted. See NECivR 56.1. Unless a more specific citation is given, the facts recounted below are derived from the parties' statements of undisputed fact. I find the following facts to be the material ones:

---

[1]Nebraska changed its regulatory scheme after I issued a temporary restraining order. (See Filing 8.) Thereafter, the plaintiffs abandoned their claim for money damages, but they did not abandon their claim for attorney fees. (Filing 39.) The pending motions for summary judgment *do not* address whether the plaintiffs are entitled to attorney fees because they obtained a temporary restraining order or because Nebraska apparently changed its regulations as a result of that temporary order. Thus, I will request additional advice from the lawyers as to these issues.

### *The Spierings and Their Religious Beliefs*

1.      Although they are not formally members of the church (filing 79 ¶ 5), Ray and Louise Spiering follow the teachings of Scientology as they understand those teachings.  They are sincere in their beliefs.  That said, I do not determine whether the Spierings correctly understand and follow the true doctrines of Scientology.  "[C]ourts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."  <u>Employment Div., Dep't of Human Res. of Oregon v. Smith</u>, 494 U.S. 872, 887 (1989) (the Free Exercise Clause permits a state to prohibit sacramental peyote use and thus to deny unemployment benefits to persons discharged for such use).

2.      The Spierings' religious beliefs include the concept of "Silent Birth." Based on this religious tenet, and among other things, they believe that parents should insulate their newly born infants from pain during the birth process and for a period of seven days after birth.  The Spierings sincerely believe that subjecting a child to the pain and trauma of a blood draw within seven days of birth violates the religious precept of "Silent Birth" and could cause the child to later suffer physical or mental injury.

3.      The Spierings are sexually active.  They do not use birth control measures.  Given the difficulty that the Spierings experienced with Nebraska over the birth of their fourth child (discussed next), and the real possibility that Mrs. Spiering may become pregnant again, this case presents a live controversy, this case is ripe and it is not moot.

### *The Spierings' Four Children and the Temporary Restraining Order (TRO)*

4.      The Spierings have four children.  The Spierings have no family history of any of the disorders screened for by the State of Nebraska.

-3-

5.      The oldest child was born in Minnesota and the Spierings were allowed to opt out of testing based upon their religious beliefs.  In contrast, and despite the fact that all states require some type of testing, Nebraska is one of the few states that do not allow an exemption for testing based upon religious grounds.[2]

6.      The next two children were born in Nebraska.  Although they would have preferred to wait seven days, through the help of their physician, the Spierings were able to delay testing for these children for five days.

7.      The Spierings' fourth child was the original focal point of this litigation. When the Spierings learned that their physician would no longer help them delay testing, and prior to the birth of their fourth child, they filed suit.

8.      On December 17, 2004, and presented with the impending birth of the fourth child, I granted a TRO prohibiting Nebraska from enforcing its then current regulations regarding metabolic testing against the Spierings until the eighth day after the plaintiff's fourth child was born.  (Filing 8.)  In that decision, I emphasized that "my mind may well be changed by a better developed record and briefing."  (Id. at 3.) Nonetheless, I was particularly concerned that Nebraska's regulatory scheme, as then constituted, contained an odd quirk.  If the child was born in a hospital, a blood draw for testing was required within 48 hours, but if the child was born at home, the blood draw could be completed seven to ten days after the child was born.  Despite this difference, Nebraska refused to accommodate the Spierings' desire to delay the testing of their infant for seven days.  The practical result of Nebraska's position was to force Mrs. Spiering to give birth at home rather than in a hospital if she desired to

_____

[2]See Francy E. Foral, Necessity's Sharp Pinch: Parental and States' Rights in Conflict in an Era of Newborn Genetic Screening, 2 J. Health & Biomedical L. 109, 111, 121 (2006) (all states mandate testing, but some have exemptions).  According to this commentator, Nebraska, Michigan, Minnesota, Montana and South Dakota do not provide a religious exemption.  Id. at 121 n.82.

follow her religious beliefs. Because the "born-at-home" exception seemed unrelated to the health of the infant or the health of the mother and because it also provided an unintended incentive to Mrs. Spiering to endanger herself and her infant, I granted temporary relief. Nonetheless, I ordered the Spierings to have their child tested as soon as possible after the seventh day.

9.      Shortly after I issued the temporary restraining order, the Spierings' fourth child was born. The child was healthy. After seven days, the baby was tested as I had ordered and the testing information was provided to Nebraska. (See Filing 14.)

### The Present Testing Scheme

10.      Because some diseases have potentially devastating consequences if not diagnosed and treated soon after a child is born, Nebraska law requires that all infants born in the State of Nebraska must undergo screening for certain metabolic diseases. Neb. Rev. Stat. Ann. §§ 71-519 to 71-524 (LexisNexis 2006).[3] The Nebraska Department of Health and Human Services ("Department") is authorized to promulgate regulations to implement the law. The Department depends upon an advisory panel of doctors and other experts to advise it regarding these regulations. Based upon that advice, the *current* regulations provide:

> All infants born in the state of Nebraska must be tested for the following diseases:
>
> 1.      Biotinidase Deficiency [BD];

---

[3]These statutes were amended after this suit was filed. I cite the current version of the statutes, as the amendments to the provisions I address did no more than replace "Department of Health and Human Services" with "Department of Health and Human Services Regulation and Licensure."

-5-

2. Congenital Adrenal Hyperplasia [CAH] (for specimens received at the newborn screening laboratory on or after January 2, 2006);
3. Congenital Primary Hypothyroidism [CPH];
4. Cystic Fibrosis [CF] (for specimens received at the newborn screening laboratory on or after January 2, 2006);
5. Galactosemia [GTS];
6. Hemoglobinopathies [HGP];
7. Medium Chain Acyl-CoA Dehydrogenase Deficiency [MCAD]; and
8. Phenylketonuria [PKU].

Nebraska Health and Human Services Regulation and Licensure Regulation, 181 NAC § 2-003 (effective September 26, 2005) (hereinafter "181 NAC § ___"). (The current regulations are found at Filing 71, Exhibit 2.)

11. Unlike the regulations that were in place when this case was first commenced, the general rule in Nebraska is that the screening test for babies, whether born in a hospital or not, must be performed between 24 to 48 hours after birth. In other words, the general rule is that *all* infants are subject to the 24- to 48-hour specimen collection requirement.

12. Hobart E. Wiltse, M.D., Ph.D., Professor Emeritus in Pediatrics at the University of Nebraska Medical Center, and Richard E. Lutz, Associate Professor of Pediatrics at the University of Nebraska Medical Center, have advised the defendants on the challenged regulations. Dr. Wiltse is of the opinion that delaying screening and thus treatment for children with PKU, GTS, MCAD, CAH and CPH for even eight days would present significant medical risks to children. Indeed, some of those diseases could cause death or permanent injury if not diagnosed and treated within the first week of life. Dr. Lutz holds similar views. In particular, Dr. Lutz has dealt with several children with GTS who experienced life-threatening complications of the

disease at four to five days of age.  The plaintiffs have presented no medical evidence that contradicts the opinions of Dr. Wiltse and Dr. Lutz.

13.     While there is no perfect time to draw the sample and do the testing given the number of illnesses that are the subject of screening, the doctors believe that the 24- to 48-hour period is the ideal.  (Filing 71, Exhibit 5, CM/ECF page 13 (Deposition of Dr. Wiltse); Filing 71, Exhibit 6, CM/ECF page 4 (Deposition of Dr. Lutz).)  Testing done within this time tends to maximize the opportunity to diagnose and properly treat the subject diseases.  This is particularly true where confirmatory tests may be needed after an initial positive test.  In addition, because the chemistry of infants is complex and changes as the baby matures, a uniform time for specimen collection allows laboratories to use standard "cutoffs" when determining what is or is not an abnormal laboratory value. (Filing 77, Exhibit 6, CM/ECF pages 14-15 (Deposition of Julie Luedtke-Miller, Manager of the Newborn Screening Program).)  Thus, the policy makers have concluded that a testing regime normalized to specified specimen collection times is more likely to produce consistent results.  (Id. at CM/ECF page 15.)

14.     For births attended by physicians, the regulations specifically provide:

PHYSICIAN DUTIES

2-005.01 Specimen Collection: For all live births, the newborn's physician must cause the collection for testing of a newborn screening specimen for metabolic diseases between 24 to 48 hours of age or immediately prior to the newborn's discharge, whichever occurs first.

2-005.01A Prior to 24 Hours of Age: If the  initial specimen for any infant is collected prior to 24 hours of age, the newborn's physician or designee must collect or cause to be collected a repeat PKU and hypothyroidism

-7-

screening specimen by 7 days of age, regardless of prior test results.

2-005.01B Sick or Premature Infants: The specimen may be collected prior to 24 hours of age if the infant is sick or premature, or if suspected of having one of the diseases screened for.  The newborn's physician or designee must collect or cause to be collected a repeat PKU and hypothyroidism screening specimen by 7 days of age, regardless of prior test results.

2-005.01C Blood Transfusion: If a newborn requires a blood transfusion prior to 24 hours of age, the specimen must be collected before the blood transfusion.  The specimen should be collected at the time blood is collected for the typing and cross match prior to transfusion.  The newborn's physician or designee must collect or cause to be collected a repeat PKU and hypothyroidism screening specimen by 7 days of age, regardless of prior test results.

2-005.01D No Specimen Collected: Upon notification by the hospital that a newborn was discharged before a screening sample was collected, the newborn's physician or designee must collect or cause to be collected a screening specimen within 48 hours of parental notification.

181 NAC § 2-005.

15.   For births where there is no physician in attendance, the regulations specifically provide:

BIRTHS NOT ATTENDED BY A PHYSICIAN:  In the event a birth is not attended by a physician, the person registering the birth (who may be the parent) must ensure that:

-8-

1.      The newborn has a newborn screening blood spot specimen collected as set out in 181 NAC 2-005.01 (between 24 and 48 hours of birth); and

2.      The specimen is submitted to the testing laboratory designated by the Department as set out in 181 NAC 2-006.01 (within 24 hours of collection).

181 NAC § 2-008.

16.     Only blood may be tested and the testing protocol requires a heel prick. 181 NAC § 2-004 & Attachment 1 (How to Collect an Acceptable Blood Spot Specimen). If the specimen is not satisfactory, Nebraska has a procedure for that eventuality:

2-005.02 Unsatisfactory Specimen: Upon receiving notice from the testing laboratory that a specimen is unsatisfactory, the newborn's physician or designee must collect or cause to be collected a repeat specimen within 48 hours of parental notification.

2-005.02A The physician or designee must make a reasonable attempt to cause the collection of a repeat specimen. A reasonable attempt includes that the physician or designee must:

1.      Immediately notify the parent, guardian, or custodian by telephone, if possible, and in writing;

2.      If there has been no response within 5 days, notify the parent, guardian, or custodian in writing by certified mail, return receipt requested, or equivalent; and

3.      If there has been no response within 10 days of first notification, notify the Nebraska Newborn Screening

Program (NNSP) in writing that obtaining a repeat
specimen was not accomplished.

181 NAC § 2-005.02.

17.     Screening specimens collected from infants who are less than one day
old are not acceptable, or they may be unreliable, for purposes of diagnosing PKU,
CAH and CPH.  There is no evidence to suggest, however, that specimens collected
from infants who are less than one day old are unusable for the diagnosis and
treatment of the other diseases which are the subject of screening.

18.     The evidence reveals that nearly 90 % (88% to 89%) of Nebraska infants
had specimens taken within 24 to 48 hours of birth. Less than 1% had specimens
taken before the infant reached 24 hours of age.  Less than 1% had specimens taken
after the infant was more than seven days old.  These statistics appear to have been
derived before the general rule was changed in September of 2005 to provide that
screening tests for all babies, whether born in a hospital or not, must be performed
within 24 to 48 hours of birth.  (Filing 77, Exhibit 5, Attachments A & B (Newborn
Screening Advisory Committee Minutes, July 19, 2005 & January 18, 2005; Filing
77, Exhibit 8 (Newborn Screening 2004 Annual Report).)

### *Notice is Given Before Testing and Enforcement Occurs Only After Court Order*

19.     The physician is required by regulation to advise the parents that the
mandatory testing will be conducted.  181 NAC § 2-005.06A ("The . . . physician .
. . must . . . [p]rovide information to the newborn's parent/legal guardian about the
diseases for which newborn screening tests are required.")  See also 181 NAC § 5-

003.03 (providing that "the attending physician must inform the parent about the required tests"), <u>available</u> <u>at</u> www.hhs.state.ne.us/nsp.[4]

20.     If the parent refuses to allow the test, then both the Nebraska statutes and the regulations require, among other things, that the appropriate county attorney or the Nebraska Attorney General commence civil proceedings when notified of a violation by the Department.  Neb. Rev. Stat. Ann. § 71-524 (LexisNexis 2006); 181 NAC § 2-009.  The law also requires that a hearing be held within 72 hours and a decision made within 24 hours after the completion of the hearing.  <u>Id.</u>

21.     There is no evidence the blood draws or tests are performed over a parent's objection until and unless a court order is obtained.  In fact, the contrary appears.  <u>Douglas County v. Anaya</u>, 694 N.W.2d 601 (Neb.) (newborn screening enforcement case; parents ordered to submit child for testing after notice and hearing), <u>cert.</u> <u>denied</u>, 125 S. Ct. 365 (2005).

### The Screening Program Does Not Compel Treatment

22.     Nebraska's screening program does not mandate treatment even if the child is found to have one of the diseases.  (Filing 71, Exhibit 5, CM/ECF page 18 (Deposition of Dr. Wiltse)).  If treatment is thought to be critical and a parent refuses it, the practice is for a county attorney to seek a court order mandating treatment.  In such a case, a hearing is held to determine whether treatment will be ordered.  (<u>Id.</u>)

---

[4]I take judicial notice of 181 NAC § 5-003.03 as it was not included in the evidence submissions.

## II. ANALYSIS

Through their very able lawyers, the plaintiffs present three claims. The first, and primary, claim rests on the First Amendment. Essentially, the plaintiffs claim that the law violates their right to freely exercise their religion while managing the affairs of their children.

The second claim rests on the Fourth Amendment. The plaintiffs claim that Nebraska's screening program amounts to an unreasonable search and seizure of their children.

The plaintiffs base their third attack on the Fourteenth Amendment. They claim the Fourteenth Amendment protects fundamental rights like parenting and the challenged law violates a parent's right to manage the affairs of his or her child.

I respectfully reject each of these arguments. My reasons for this decision are set forth below.

### A.    Nebraska's Law on Metabolic Testing of Newborns Does Not Violate the Plaintiffs' Constitutional Right to Freely Exercise Their Religion.

The First Amendment (through the Fourteenth Amendment) bars the states from enacting laws "prohibiting the free exercise" of religion. U.S. Const. Amend. I. See Smith, 494 U.S. at 876-877 (citing Cantwell v. Connecticut, 310 U.S. 296, 303 (1940)). What does that prohibition mean?

A law imposing a burden on religion might be tolerated when judged deferentially. On the other hand, that same law might be viewed with "a jaundiced eye" and found wanting when judged rigorously. To complicate matters further, the law might be judged using a probe that is somewhere between deferential and

-12-

rigorous.  In each case, the standard of review that a judge selects determines the level of skepticism that he or she must apply.

### 1. Rational Basis, and Not Strict, Scrutiny Applies.

The Supreme Court has said that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993) (law that banned animal sacrifice when used as a ritual, but which permitted most other types of animal slaughter, violated the Free Exercise Clause of the First Amendment) (citing Smith).  Thus, if a law is neutral and of general applicability, a judge examines the enactment deferentially to determine whether it is rationally related a to legitimate governmental purpose, and this is true even though the law may also incidentally burden a religious practice.  See, e.g., Anaya, 694 N.W.2d at 608 (even though it was challenged as violating the rights of parents to freely exercise their religion and to exercise their parental rights, the Supreme Court of Nebraska decided that the State's Newborn Screening Program was subject to rational basis review and found that the Newborn Screening Program was rational because the evidence showed that it promoted the purpose of the law, that is, to safeguard the health of children) (discussing and applying Smith).[5]

The plaintiffs acknowledge the foregoing.  They argue, however, that the Smith rule regarding neutral laws of general applicability and rational basis review contains

---

[5]To recite the obvious, but meaning no disrespect, I am not bound by the Nebraska Supreme Court's decision.  Indeed, the facts of Anaya are materially different than the facts of this case.  More importantly, I have seriously considered the trenchant criticisms leveled at the Anaya opinion by counsel for the plaintiffs.  Hopefully, my decision honestly addresses those concerns even though the result of that effort is not what plaintiffs desired.

two important limitations.  Because of these limitations, they argue that "strict scrutiny" must be applied.

If the plaintiffs are correct, and strict scrutiny applies, then a judge must view the law much less deferentially to determine whether the government's interest in the regulation (and any exceptions) is justified by a "compelling reason."  Smith, 494 U.S. at 884; Lukumi, 508 U.S. at 537 (same).  See also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359, 366 & n.7 (3rd Cir.) (hereinafter "FOP") (Alito, J.) (discussing various levels of scrutiny required by Smith and Lukumi; police department violated Free Exercise Clause of First Amendment when it refused religious exemptions from its prohibition against officers wearing beards, while allowing medical exemptions from same prohibition; allowing officers to wear beards for religious reasons would not create any more difficulty with regard to the public being able to identify officers or to their morale and esprit de corps than would allowing officers to wear beards for medical reasons), cert. denied, 528 U.S. 817 (1999).

In short, "[t]o survive strict scrutiny, a challenged government action must be narrowly tailored to advance a compelling government interest, whereas rational basis review requires merely that the action be rationally related to a legitimate government objective."  Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 165 & n.24 (3rd Cir. 2002) (borough's selective, discretionary application of ordinance barring private citizens from affixing signs and other items to utility poles triggered strict scrutiny of an order requiring removal of an item of religious significance; government's actions violated Free Exercise Clause of First Amendment), cert. denied, 539 U.S. 942 (2003).

With the foregoing in mind, I turn next to the plaintiffs' assertion that strict scrutiny applies.[6]  In doing so, I address the two arguments upon which they rely for their plea that the most rigorous level of inquiry is appropriate, and the more deferential approach of Smith should be rejected.

### a.  "Secular" Exemptions

The plaintiffs rely on Lukumi for their first argument.  There the Court applied exacting scrutiny because the enactment "fail[ed] to prohibit nonreligous conduct that endanger[ed] the [government's] interests in a similar or greater degree" as compared with the religiously motivated conduct that was prohibited.[7]  Lukumi, 508 U.S. at 543 (ritual sacrifice was prohibited, but other animal slaughter was not).  In other words, if the government exempts one type of conduct, say "behavior A," in a manner that threatens to undermine the purpose of the regulatory scheme at issue, the government cannot fail to exempt similar conduct, say "behavior B," merely because "behavior B" has a religious motivation and "behavior A" does not.  In that case, the law is not one of "general applicability."  Id. at 545-546.

While I acknowledge the principle, I reject the predicate for the plaintiffs' "secular exemption" argument.  Nothing in Nebraska law, as it is presently constituted or applied, amounts to an inconsistency that "endangers the

---

[6]The defendants do not brief the question of whether Nebraska law would survive strict scrutiny.  Because I find that rational basis scrutiny applies, and the defendants have not briefed the "strict scrutiny" question, it is both unnecessary and unwise to decide whether the law would pass muster if judged under a more rigorous standard.  I therefore decline to do so.

[7]The Supreme Court was concerned with the government "deciding that secular motivations are more important than religious motivations."  FOP, 170 F.3d at 365.  Hence the label "secular."

-15-

[government's] interest in a similar or greater degree" as compared to delaying testing eight days.  Among others, I have the following specific reasons for this conclusion:

\*        First, the law now requires that testing of *all* infants, whether born in a hospital or at home, be conducted within 24 to 48 hours.  181 NAC §§ 2-005.01 & 2-008.  In fact, the compliance rate with the 24- to 48-hour standard was nearly 90% *before* the law was changed to require that all infants be tested within 24 to 48 hours. Furthermore, there is no evidence that the State of Nebraska has a custom or practice of encouraging doctors, hospitals or parents to ignore the general rule once it was changed in 2005.

\*        Second, the provisions in 181 NAC §§ 2-005.01A-C for situations where the child is inadvertently tested prior to 24 hours of age, or where the child is intentionally tested before 24 hours of age because of sickness or prematurity or because the child may be suspected of having a particular disease, or where the child is intentionally tested before 24 hours of age due to the need for blood transfusion, are hardly "secular" exemptions.  Indeed, they require that the child be *tested twice* and the governmental interest supporting the regulatory scheme is therefore furthered, not endangered, by these provisions.  Furthermore, the fact that the *second test* must be completed within seven days hardly suggests that the plaintiffs are being singled out for refusing to allow *any test* within that same period.  In this regard, the first test, even if done prior to 24 hours, is likely to have utility for the diagnosis and treatment of some, but not all, diseases.  Thus, an infant that is not tested at all within seven days would appear to be at greater risk than an infant who is tested once prior to 24 hours and then again six days later.  In sum, the purpose of the *retesting* regimen is consistent with, and does not contradict, the reasons for the law, that is, child safety.

\*        Third, the fact that the regulations contemplate that a hospital may make a mistake and discharge an infant before a screening sample is taken, and thus the baby's physician is required to see that testing is completed within 48 hours of

-16-

parental notification, 181 NAC § 2-005.01D, is consistent with, and not contrary to, the purpose of the 24- to 48-hour testing standard.  Again, it tortures the language to characterize this provision as a "secular" exemption unrelated to the safety purposes of the law.

\*      Fourth, the same thing is true for the "exception" found at 181 NAC § 2-005.02 requiring retesting within 48 hours of parental notification when the first specimen is found wanting.  This provision is not inconsistent with the purposes of the law.

\*      Fifth, while the plaintiffs' lawyers might be able to design a faster or better system than the one adopted by Nebraska, that is beside the point.  Relevant to this discussion on "strict scrutiny," Nebraska need only show that its law is one of general applicability—it need not prove perfection.

### b.  Hybrid Claims

Not to be deterred, the plaintiffs also claim that "strict scrutiny" applies when a religious claim is married to a claim involving the fundamental rights of parents.  For this argument, the plaintiffs rely upon the Court's discussion of those types of claims in Smith.  Smith, 494 U.S. at 881 & n.1, 882.  There are two reasons why the plaintiffs' "hybrid" rights argument does not justify the application of "strict scrutiny."

The first reason is simple.  As pertinent here, Smith only alluded to the possibility of "strict scrutiny" where a "free exercise" claim was connected to a claim regarding the right of parents to control *the education* of their children.  Id. at 881 ("The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in

-17-

conjunction with other constitutional protections, such as . . . the right of parents, acknowledged in <u>Pierce v. Society of Sisters</u>, 268 U.S. 510 (1925), to direct the education of their children, see <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school.)").  Since that is not the case here, the "hybrid rights" justification for strict scrutiny does not apply as a categorical matter.

The second reason for rejecting the "hybrid" rights claim to strict scrutiny is more complex.  It is also more compelling.

It is true that the Due Process Clause of the Fourteenth Amendment protects the "fundamental right" of parents to make decisions as to the care, custody and control of their children.  <u>See</u>, <u>e.g.</u>, <u>Troxel v. Granville</u>,  530 U.S. 57, 65-66 (2000) (striking down a statute that authorized a court to grant any person the right to visit a child if such visitation was in the best interests of a child even if a fit parent thought otherwise).  But it is equally true that "a state is not without constitutional control over parental discretion in dealing with children <u>when their physical or mental health is jeopardized.</u>"  <u>Parham v. J. R.</u>, 442 U.S. 584, 603 (1979) (even where parents agree to mental health commitment, children are entitled to the decision of a neutral fact finder to determine whether statutory requirements for admission are satisfied) (emphasis added).  And this "constitutional control over parental discretion" when a child's safety is at issue exists for Nebraska and every other state, even where religious and parental rights are asserted in tandem.  <u>Prince v. Massachusetts</u>, 321 U.S. 158, 166-167 (1944) (upholding child labor laws applied to custodian of a child who allowed minor to distribute religious literature; the "<u>right to practice religion freely does not include liberty to expose [a] . . . child . . . to ill health or death.</u>") (emphasis added).

-18-

The precedents of the Court thus recognize two competing values of equal worth:  the right of parents to parent and the right of children to safety.  It is not plausible that the Supreme Court would apply "strict scrutiny" and thus tilt the table in favor of the rights of parents and against the safety of children.  That is all the more true where, as here, the medical evidence establishing a "life and death" reason for testing infants is undisputed and, still further, where a parent's objection to either the test or treatment following the test will be resolved by a court after a hearing.  As a result, it is not surprising that the plaintiffs have given me no case which stands as a precedent for the proposition they advance.  See, e.g., Eugene Volokh, Parent-Child Speech and Child Custody Speech Restrictions, 81 N.Y.U. L. Rev. 631, 675 (2006) (recognizing that the Supreme Court's jurisprudence on "the substantive due process right to control the upbringing of one's child" has had "fairly modest force"; "The Supreme Court has never clearly articulated when they can be restrained.  Lower courts have often assumed that various reasonable restrictions on such rights would be permissible, and that such restrictions need not be judged under the 'strict scrutiny' test.") (citing Anaya; other citations omitted).

### 2.    *The Law is Rationally Related to a Legitimate Governmental Purpose.*

The plaintiffs make no effort to defeat the law on rational basis grounds.  Rather, they base their attack on the assumption that "strict scrutiny" applies.  Despite that position, I must satisfy myself that Nebraska's metabolic screening program is rationally related to a legitimate governmental purpose.  I proceed to that task next.

First, screening of newborns for metabolic diseases is justified by the government's legitimate interest in safeguarding the health of children.[8]  See, e.g.,

---

[8]Nebraska's concern for children includes a very real "dollars and cents" issue.  As Dr. Wiltse discussed, the huge financial costs of caring for a child with one of these diseases is frequently shifted to state governments even though some or all of

Anaya, 694 N.W.2d at 608 ("Evidence was presented concerning the effects of the diseases that are tested for under the statute. Early diagnosis allows for prevention of death and disability in children. The State has determined that it is appropriate to test for these diseases soon after a child is born in order to address treatment options. The health and safety of the child are of particular concern, as are the potential social burdens created by children who are not identified and treated."); Newborn Screening: Toward a Uniform Screening Panel and System, Report for Public Comment, Executive Summary at 3 (2005) ("Universal newborn screening is an essential public health responsibility that is critical to improve the health outcome of affected children.") (hereinafter "Uniform Screening Panel Report").[9]

Second, both the evidence in this case, and the scientific literature more generally, shows that there is a "fit" between the government's interest in safeguarding the health of children and Nebraska's Newborn Screening Program. Three examples taken from the Uniform Screening Panel Report illustrate this point:

\* Eminent national investigators have concluded that "the conditions best meeting all of the criteria [for determining the appropriateness of newborn testing] are MCAD, CH and PKU" and Nebraska tests for these diseases. Compare id. at 10-11 with 181 NAC § 2-003(3), (7) & (8) (note that the Uniform Screening Panel Report refers to Congenital Primary Hypothyroidism as "CH" and the Nebraska regulations use "CPH").

_____

those costs could have been avoided had a screening test been conducted. (Filing 71, Exhibit 5, CM/ECF page 16 (Deposition of Dr. Wiltse).)

[9]The Uniform Screening Panel Report was authored by the American College of Medical Genetics and commissioned by the United States Department of Health and Human Services, Health Resources and Services Administration. The Report is available at mchb.hrsa.gov/screening.

\*      All eight diseases screened for by Nebraska are among the diseases for which national experts believe newborn testing is appropriate.  Compare id. at 11-12 (table 2) & Note with 181 NAC § 2-003(1)-(8).

\*      Nebraska uses a 24- to 48-hour time frame for testing and that standard is consistent with national recommendations.  Compare id. at 3 ("To be included as a primary target condition in a newborn screening program, a condition should meet the following minimum criteria . . . It can be identified . . . 24 to 48 hours after birth . . . .") with 181 NAC §§ 2-005 & 2-008.

In summary, I conclude that Nebraska's program is rationally related to a legitimate governmental interest.  That said, I offer one additional comment.  I am acutely aware that Nebraska's program, unlike the situation in some other states, allows no exemptions for religious reasons.  Whether that is a wise policy, I do not know.  My job as a federal judge, particularly when applying rational basis scrutiny, does not allow me to second guess the politically accountable branches of Nebraska's government on this very sensitive and important issue.

### B.     Nebraska's Law on Metabolic Testing of Newborns Does Not Violate the Fourth Amendment Ban Against Unreasonable Searches and Seizures.

The Fourth Amendment to the Constitution prohibits unreasonable searches and seizures.  U.S. Const. Amend. IV.  The plaintiffs assert that Nebraska's Newborn Screening Program violates this prohibition.  On this record, I disagree.

Put simply, (1) since parents are advised that the testing will be done, thus triggering an opportunity to object and temporarily prevent the testing (as was the case here and in Anaya), and (2) since Nebraska's testing requirement is only enforced by court order following a hearing, no Fourth Amendment violation has been made out and none is threatened.  Compare King v. Beavers, 148 F.3d 1031,

1034 & n.3 (8th Cir.) (seizure of ward pursuant to a guardianship order was not unconstitutional; holding that the Fourth and Fourteenth Amendments are "not violated if the State takes custody of a citizen following a judicial determination that he is unable to care for himself or is a serious risk to the safety of himself . . . ."), cert. denied, 525 U.S. 1002 (1998) with Dubbs v. Head Start, Inc., 336 F.3d 1194, 1207 (10th Cir. 2003) (the Fourth Amendment would be violated if young children were subjected to intrusive physical examination and blood tests without consent of the parents or without a court order or without a showing of "special needs"), cert. denied, 540 U.S. 1179 (2004).[10]

A caution:  Although the parties may wish me to do so, I do not determine whether the Fourth Amendment would be violated if a physician, acting pursuant to Nebraska's regulations, performed a blood draw and conducted the testing over the objection of parents and without a court order.  Those are not the facts of this case, and I will not express an opinion on that abstract question.

### C.   To the Extent That the Fourteenth Amendment Contains a Substantive Component Protecting "Fundamental Rights," Such as the Right of a Parent to Manage His or Her Children, Nebraska's Law on Metabolic Testing of Newborns Does Not Violate such Rights.

The plaintiffs also assert a substantive due process claim under the Fourteenth Amendment predicated upon their "fundamental rights" as parents.  I have thoroughly discussed the matter of parental rights previously when I resolved the "hybrid claim"

---

[10]Given the right facts, a Fourth Amendment violation might be proven even where a court has authorized the seizure of a child.  See, e.g., Heartland Acad. Cmty. Church v. Waddle, 427 F.3d 525, 533 (8th Cir. 2005) (seizures of children at private boarding school by state juvenile officer pursuant to state ex parte order were unreasonable in violation of Fourth Amendment when based on stale information, misinformation and material omissions regarding alleged child abuse).  That acknowledged, this case does not present those facts.

portion of plaintiffs' First Amendment argument.  In so doing, I found that the precedents of the Supreme Court recognize that the right of a parent to parent and the right of a child to safety are of equal value; that "strict scrutiny" does not apply; and that the statute is rationally related to the legitimate governmental objective of protecting children from death or serious injury.  That same reasoning causes me to deny the plaintiffs' Fourteenth Amendment claim.

### III.  CONCLUSION

I thank the lawyers for their helpful briefs.  More importantly, I compliment them for their commitment to civility and professionalism.

IT IS ORDERED:

1.   The defendants' motion for summary judgment (filing 69) is granted and the plaintiffs' motion for summary judgment (filing 75) is denied.  The stipulations (filings 78 and 84) are approved.

2.   My legal assistant shall schedule a telephone conference with counsel to discuss the further progression of this case.

September 12, 2006.          BY THE COURT:

                             *s/ Richard G. Kopf*
                             United States District Judge

-23-